UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA,           )
                                    )
v.                                  ) 1:11-cr-00191-DBH
                                    )
SANTOS HERASMO ELIAS-LOPEZ          )
                                    )
    Defendant                       )

**RECOMMENDED DECISION
RE: MOTION TO SUPPRESS
(DOC. NO. 23)**

Santos Elias-Lopez has filed a motion to suppress two separate sets of statements he made to law enforcement personnel on September 21, 2011. The first statements were made at the Cancun Restaurant in Waterville, Maine, and subsequent, post-Miranda warning statements were obtained at Homeland Security Investigations headquarters in South Portland, Maine. I now recommend that the Court adopt the following proposed findings of fact and grant in part and deny in part the motion to suppress.

### PROPOSED FINDINGS OF FACT

Special Agent Michael Myers who works with Homeland Security Investigations in Manchester, New Hampshire, arrived in Maine on September 21, 2011, to assist his fellow agents during a search conducted at the Cancun Restaurant in Waterville, Maine. Myers, who has law enforcement experience as a federal air marshal and as a border patrol agent, speaks fluent Spanish. Approximately nine or ten other agents were involved in the search operation at the Waterville restaurant and at the home of the restaurant's manager, Hector Fuentes. Myers's role during the restaurant search involved securing the workers at the scene and determining their "alienage" in order to ascertain if they were legally in the United States.

Myers first encountered Elias-Lopez in the kitchen, placed him in handcuffs and took him to the dining room where he joined other employees who had been similarly secured. Two workers had been on the upper story or roof of the building and were brought to the dining room, possibly at gunpoint. If the agents securing these two individuals did draw their weapons, they were the only ones who drew handguns during this process, although all eleven officers at the scene were armed with firearms. Myers did not ever draw his gun or threaten or intimidate Elias-Lopez in any way. In a group setting, with all the employees secured in handcuffs, Myers, and other agents working with him, asked each employee where he was born, where he was from, and whether he was legally working and living in the United States. The agents wanted to determine if any of the workers were legally in the United States in order to release those individuals, if any, who should not be detained on immigration holds. All of the workers were searched and their personal property, including documents, was inventoried by the officers. The officers spent over an hour with the employees at the restaurant.

Myers recovered what he recognized as a counterfeit alien registration card from Elias-Lopez. After reviewing the "green card," and making his own determination about its authenticity, Myers then questioned Elias-Lopez about the card, asking him if he knew the card was a fake. Elias-Lopez, who appeared to fully understand Myers's questions, responded in the affirmative. He was then detained for immigration purposes.

Myers and an agent named Mahoney transported the workers to South Portland and placed them in detention cells. In order to transport the workers they were placed in leg irons and "belly chains" because, according to Myers, this arrangement is more comfortable for transport purposes than the use of handcuffs fastened behind a person's back. Myers was not

himself involved in the arrest of Hector Fuentes, the restaurant manager who was arrested at his home and brought to the restaurant by other agents.

At the South Portland facility, Special Agent William Hoyt became the primary investigator assigned to interview Elias-Lopez. Hoyt has worked for Homeland Security Investigations since June 2007, and prior to that time he worked with the Border Patrol on the southern border of the United States. Hoyt speaks Spanish, although he does not claim to be completely fluent in the language. He is able to conduct a basic investigatory interview in Spanish and has done so on prior occasions. Hoyt was able to read Miranda rights in Spanish to Elias-Lopez (see Gov't Ex. 1). Elias-Lopez signed the form indicating that he understood his rights and was willing to speak with the officers. Hoyt was not involved in either the execution of the search warrant at the restaurant or the original arrest and transport of Elias-Lopez to South Portland. His role in the original raid had been limited to arresting Hector Fuentes at his home and then going to the restaurant where Fuentes was taken.

After obtaining what he determined to be a valid waiver of rights, Hoyt conducted an interview with Elias-Lopez in Spanish. Hoyt did not know Elias-Lopez's educational background, but he assumed that Elias-Lopez had minimal education based on Hoyt's own prior experiences with individuals in similar circumstances. During the interview, Hoyt was wearing a t-shirt with his agency's insignia on it and in accordance with agency policy his firearm had been secured in a separate room. There was no assaultive behavior, yelling, raising of the voice, or traumatizing events during the interview. Hoyt described Elias-Lopez as polite and cooperative, giving no indication that he did not understand or wish to respond to the questions. Elias-Lopez was given a sandwich to eat at some time during the interview process. The conversation lasted between twenty and thirty minutes and related to how Elias-Lopez entered the country and other

3

information about his background.  Elias-Lopez came to the United States from Guatemala and wanted to work and earn money to send home to his parents and family.

The defense presented the testimony of Dr. Charles Robinson, a clinical and forensic psychologist from Manchester, Maine, who has previously testified in numerous cases. Robinson was asked to evaluate defendant's capacity to understand and knowingly, voluntarily, and intelligently waived his Miranda rights.  Dr. Robinson has extensive experience with individuals from developing nations, including non-English speakers, and has previously examined those individuals with an eye toward assessing their understanding of Miranda and the voluntariness of any waiver they may have been asked to give.  Robinson does not himself speak Spanish and his interview of Elias-Lopez was conducted through an interpreter.  He has never been to Guatemala nor has he specifically studied Guatemalan or Mayan culture or dialects.

When he initially met with Elias-Lopez and the interpreter, Robinson encountered difficulty in explaining to Elias-Lopez why he was there and the rules regarding confidentiality that would or would not apply to their interview.  He believed Elias-Lopez's comprehension to be limited.  Robinson undertook to examine the circumstances under which Elias-Lopez made these statements and draw his conclusions based upon a three part perspective.  His first inquiry related to how Elias-Lopez's "biology" would inform his encounter with the agents.  Specifically Robinson considered major medical illnesses and innate cognitive capacities when making this assessment.  His second area of concern related to psychological factors, giving due consideration to Elias-Lopez's personality and psychological makeup.  Finally, Robinson considered the social and cultural factors that would inform the transaction.

In considering Elias-Lopez's cognitive capacity and intellectual functioning Robinson concluded that Elias-Lopez has very limited abstract reasoning capacity.  He also believed that

4

Elias-Lopez probably had an I.Q. in the borderline range, although Robinson conceded that he had performed no I.Q. test and that there are no culture-free I.Q. measurements to administer to someone from Elias-Lopez's cultural background. Robinson did ask Elias-Lopez to perform an abstract reasoning task as part of his basic mental status examination. When asked to explain how a green chile and a red chile are alike, Elias-Lopez was unable to answer the question. Similarly, when Robinson asked him to restate the Miranda warnings in his own words, he could not do so. According to Robinson, studies have shown that the best way to insure a person understands the Miranda warning is to ask him to restate each of the rights in his own words, something Elias-Lopez was unable to do.

In terms of the psychological factors that Robinson assessed, he did not report that Elias-Lopez suffered from any major psychological illness or disorder. Robinson described Elias-Lopez as a shy individual who wanted to please those in positions of authority. Elias-Lopez only made eye contact with the interpreter and did not look directly at Robinson when he was speaking. Elias-Lopez was described as a socially compliant individual who would be frightened by the experience of having been placed in handcuffs and having seen his boss, Hector Fuentes, in handcuffs as well, even though he reported that the officers had been polite to him and had not mistreated him in any way. Elias-Lopez's primary emotional state was sadness and worry because he could not work and send money to his parents. Based upon the other evidence presented by the lay witnesses in this case, I find no reason to doubt this assessment of Elias-Lopez's basic personality.

Finally, Robinson offered the opinion that a number of cultural factors informed Elias-Lopez's decision to speak freely with the officers. The defendant is twenty-six years of age and grew up in a village with 2,000 residents in Guatemala. He and his seven siblings were the sole

source of income for the family.  He had essentially no formal education (although I note that he appeared to be able to sign his name on the Miranda warning form) and he was unable to read the Spanish language.  Elias-Lopez's primary motivation was to work hard and earn money that he could send to his family in Guatemala.  Elias-Lopez had had no contact with the police or military in Guatemala.  He explained that he was a good person who had never been involved with drugs and would not have been the subject of police inquiry.  Although he had no direct contact with the police, his cultural perception was that the police should be feared and one should answer their questions truthfully if one was not involved with drugs and had nothing to hide.

Based on the totality of the circumstances, including Dr. Robinson's testimony, I find that Elias-Lopez had limited education and experience with law enforcement.  He is certainly the type of person who wanted to comply with the officer's requests and answer their questions.  He understood what they were asking him and his answers were responsive to their questions.  While his understanding of the abstract concepts underlying the Miranda warning was limited, he was able to make an informed decision about answering questions after being told he was not required to speak with the officers.

## DISCUSSION

Elias-Lopez argues that the statements made to Special Agent Myers at the Cancun Restaurant must be suppressed and cannot be used by the Government in its case in chief because those statements were the product of a custodial interrogation and there was no Miranda warning given.  As to the statements made to Special Agent Hoyt at the South Portland detention facility, Elias-Lopez argues that they should also be suppressed under the "cat out of the bag" theory arising from the earlier, unwarned, admissions.  The defendant also argues that his waiver

6

of Miranda rights was not knowing, intelligent, and voluntary. Additionally, Elias-Lopez argues that all his statements were involuntary and should be suppressed for that reason. Elias-Lopez has not raised any Fourth Amendment arguments regarding the inventory search of his personal effects.

A.      **Voluntariness**

Turning first to Elias-Lopez's contention that all of his statements to both Myers and Hoyt should be suppressed because they were involuntarily compelled, regardless of whether or not there was any Miranda violation, I am satisfied that Elias-Lopez's responses were voluntary in the legal sense. The burden is on the government to prove that the defendant's statements were voluntary by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972). The government must show that, based on the totality of the circumstances, the investigating agents neither "broke" nor overbore the defendant's will, Chambers v. Florida, 309 U.S. 227, 240 (1940), and that his statements were "the product of a rational intellect and a free will," Blackburn v. Alabama, 361 U.S. 199, 208 (1960). See also Lynumn v. Illinois, 372 U.S. 528, 534 (1963). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'." Colorado v. Connelly, 479 U.S. 157, 167 (1986). Coercive police activity may include either the creation of a susceptible psychological state in the person interrogated, Townsend v. Sain, 372 U.S. 293, 307-308 (1963) (concerning alleged administration of "truth serum" to quell heroin addict's withdrawal symptoms), or the exploitation of an existing psychological condition, Blackburn, 361 U.S. at 207-208 ("[A] most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane.")

7

That Elias-Lopez's choice to speak to the agents arose because of his cultural background, his intellectual functioning, and his personality simply states the obvious. If he had been a street-wise hardened criminal, well versed in American law and culture, not the least bit shy or compliant, he might have made a different choice. His personal characteristics, which many would find admirable personality traits, certainly did not suggest any use of drugs or major mental illness. Elias-Lopez was not exploited or manipulated by the investigating officers. They did nothing to compel him to make these statements and there is no reason to treat these statements as involuntary.

**B.      Statements Made at the Cancun Restaurant**

As a general rule, when a suspect is in custody and subject to an interrogation, law enforcement personnel are required to provide that suspect with information regarding his rights, including the right to remain silent. Dickerson v. U.S., 530 U.S. 428 (2000); Miranda v. Arizona, 384 U.S. 436 (1966). A custodial situation necessitating Miranda warnings arises only where "there is 'a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)); accord United States v. Quinn, 815 F.2d 153, 160 (1st Cir. 1987) ("[W]e do not understand the Supreme Court to have required Miranda warnings in situations other than 'custody' as traditionally understood."); Fisher v. Scafati, 439 F.2d 307, 310 (1st Cir. 1971) ("Custody, in the Miranda sense, must require at least some objective manifestation that the defendant was 'deprived of his freedom of action in [a] significant way.'") Relying upon this line of cases, the United States argues in its responsive brief that the situation at the Cancun Restaurant was noncustodial. (Gov't Response at 3-6, Doc. No. 29.) Following the evidentiary hearing on the motion, and faced with a somewhat incredulous magistrate judge,

the Assistant United States Attorney appeared to retreat from that position and has filed a supplemental memorandum (Doc. No. 37), with leave of court, suggesting an independent basis for the admission of the statements.

I am satisfied that Elias-Lopez was sufficiently restrained at the Cancun Restaurant so that the situation should be considered custodial. He was not told he could leave while the officers executed a search warrant. He and his co-workers were placed in handcuffs and physically taken into the dining room of the restaurant. He saw his immediate supervisor brought to the restaurant, also in handcuffs. There was an overwhelming show of physical force occasioned by the presence of eleven federal officers carrying weapons and displaying agency insignia.

Nevertheless, as the United States argues in its supplemental memorandum, there is an independent basis for admitting at least some of the responses to questions asked by Agent Myers. The Government relies upon the exception that has been carved out for routine "booking" questions asked during custodial interrogation for purposes other than obtaining incriminating statements on underlying criminal charges. Pennsylvania v. Muniz, 496 U.S. 582, 601-602 (1990) (holding that generic information obtained in the booking process falls outside of Miranda's scope). In the present case, the officers apparently had probable cause to believe at least some of the workers at the Cancun Restaurant were illegal aliens. Therefore, I can accept that preliminary questions limited to name, age, and country of origin could be viewed as akin to "booking" questions, as the officers needed to sort out who was to be detained for deportation and who, if anyone, should be released. However, Myers's questioning went further. After discovering what he believed to be a fraudulent alien registration document on Elias-Lopez during an unchallenged inventory search of his person, he asked the defendant if he knew the

9

card was fraudulent. That question could only have been designed to elicit an incriminating response; it was not in the nature of a booking question. Elias-Lopez's response should be suppressed because the statement was obtained in violation of Miranda. Whether Elias-Lopez admitted or denied that he knew the card was forged, it appears clear to me that Agent Myers did not intend to release him at the scene once his preliminary "booking" type questions had been completed. I do not think that Myers's lack of knowledge as to whether or not Elias-Lopez would face criminal charges is determinative. Stansbury v. California, 511 U.S. 318, 324-325 (1994) (reiterating that a police officer's subjective intent is irrelevant to whether a suspect is in custody for Miranda purposes). A law enforcement officer does not necessarily know that charges will or will not be brought until the prosecutor approves the criminal prosecution of an individual. That fact can hardly be the dividing line as to whether or not there has been a custodial interrogation.

## C.     Statements at the South Portland Detention Facility

Two issues are not disputed as to this interrogation. Clearly it was a custodial interrogation and clearly Special Agent Hoyt complied with Miranda warnings. The defendant maintains that the statements he made to Hoyt should nevertheless be suppressed because his waiver of Miranda rights was not made knowingly and intelligently and because, even if he made a knowing waiver, the prior unwarned statements made to Myers tainted his subsequent admissions under a "cat out of the bag" theory.

Elias-Lopez primarily relies upon Missouri v. Seibert, 542 U.S. 600 (2004) in support of his argument that the unwarned "interrogation" by Myers tainted Hoyt's subsequent interrogation to such an extent that, even if Elias-Lopez understood and knowingly waived his Miranda rights, the resulting statements must be suppressed. (Def.'s Response to Post-Hearing

Mem. at 2, Doc. No. 38.) The facts of Seibert are totally inapposite to the current case. The primary distinction is that in Seibert warned and unwarned interviews were conducted by the same officers, in the same location, separated only by a 20-minute break. The unwarned initial interview of Seibert was a 30 to 40 minute intensive interrogation, not a brief questioning regarding routine matters with only one question actually designed to elicit an incriminating statement. Additionally, a plurality of the Court in Seibert seemed particularly troubled that the officers' interrogation tactic was a deliberate attempt to subvert the core meaning of the Miranda warnings, although declining to focus its analysis on the subjective intent of the interrogating officer. Id. at 623 (O'Connor, J., dissenting) ("[T]he plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer.") While I am not convinced that Myers's subjective knowledge about the possibility of criminal charges is particularly relevant to this inquiry, an objective analysis of the evidence in this case supports the conclusion that Myers was not conducting an interrogation concentrating on a criminal violation, even though he may have technically run afoul of the Miranda ruling because of the scope of his questions.

In Oregon v. Elstad, 470 U.S. 298, 305-306 (1985), the Supreme Court rejected the notion that the Miranda exclusionary rule should incorporate the "fruit of the poisonous tree" doctrine described in Wong Sun v. United States, 371 U.S. 471(1963). In Elstad, the Court held that an unwarned confession did not prevent the introduction in evidence of a subsequent, post-Miranda warned confession, rejecting an argument that the latter confession was the "fruit" of the psychological pressure created by the prior, unwarned confession. 470 U.S. at 300. The Court concluded that the presumption of coercion applied to the initial, unwarned confession could not be extended to the subsequent confession because the causal connection between the two confessions was "speculative and attenuated at best." Id. at 313-314. Although the Court in

11

this way denied that the later confession was the "fruit" of the prior confession, the Court also observed that insofar as the Miranda exclusionary rule is keyed to a presumption of coercion, rather than a finding of coercion in fact, there is no valid reason to extend the presumption beyond the unwarned statements to other reliable evidence. Id. at 306-307 & n.1, 314. The Seibert majority, in spite of dire warnings from the dissent, did not overrule Elstad. Seibert, 600 U.S. at 622-623 (O'Connor, J., dissenting) ("The plurality devours Oregon v. Elstad even as it accuses petitioner's argument of "disfigur[ing] that decision.") (citations omitted). This present case, with its two sets of interrogations, in different locations by different officers, is more like Elstad than Seibert, and the presumptive "taint" of the prior unwarned statement did not necessarily inform the second conversation. As I indicated above, I am satisfied that coercive police conduct played no role in either interrogation and that all of the statements made by Elias-Lopez were voluntary in that sense.

The final consideration relates to whether or not Elias-Lopez, even though he heard the Miranda warning, was actually capable of making a knowing and intelligent waiver of those rights. The First Circuit Court of Appeals requires the Government prove, by a preponderance of the evidence based on the totality of circumstances, both an uncoerced choice to speak *and* the "requisite level of comprehension" in order for a waiver of Miranda to be valid. United States v. Rojas-Tapia, 446 F.3d 1, 4 (1st Cir. 2006) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986) (emphasis added)). Elias-Lopez's limited education and possibly limited intellectual functioning,[1] in the absence of official coercion or intimidation, is not dispositive of the issue of whether there was a knowing waiver.

---

[1] Dr. Robinson testified that he really could only approximate I.Q. level and that there was no test given to the defendant nor any basis to apply a number to his level of intellectual functioning. A relatively low I.Q., standing alone, is not dispositive of the waiver determination. United States v. Rojas-Tapia, 446 F.3d at 7.

In the present case, Elias-Lopez appeared to the officers as though he understood his predicament and his rights. His character was such that his "free choice" was to explain to the officers how important it was for him to work and earn money and how sad he was that he would not be able to send the money home to his parents. I note that he signed the Miranda form with a legible signature and gave responsive answers to all the officer's questions, facts that seemingly undercut the notion that his intellectual functioning was minimal. Elias-Lopez did not appear to Hoyt to be confused, but did appear to understand and appreciate his situation. I am satisfied, based on the totality of circumstances, that Elias-Lopez made a knowing and intelligent waiver of his Miranda rights.

## CONCLUSION

Based on the foregoing, I recommend that the Court grant in part the motion to suppress and exclude the statement made to Agent Myers at the Cancun Restaurant concerning Elias-Lopez's knowledge about the fraudulent identification card. I further recommend the Court deny the motion as to those statements made to Myers prior to questioning him about the card and deny the motion as to the statements made to Hoyt.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

February 6, 2012 /s/ Margaret J. Kravchuk
U.S. Magistrate Judge